GERARDO JORGE RODRÍGUEZ ET AL., Plaintiffs and Appellees, *v.* HEIRS OF NEREO PIRAZZI, ETC., Defendants and Appellants.

No. 12407. Decided December 5, 1963.

496

*José Guillermo Vivas* for Josefina Pirazzi de Méndez. *E. Martínez Rivera* and *E. Martínez, Jr.,* for Rafael Pirazzi. *Guillermo S. Pierluisi* and *R. Hernández Colón* for appellees.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

On May 5, 1928, Juana Rodríguez Morales and her son, Gerardo Jorge Rodríguez, were the owners of a coffee plantation called "La Molina," situated in the ward of Tibes of Ponce, having an area of 264.25 cuerdas devoted mostly to the cultivation of coffee and the remainder to truck gardening, pasture and underbrush, with several structures, houses, machinery and establishments for agricultural purposes. On that date, and with the consent of Andrea Rodríguez, wife of Gerardo Jorge, they constituted a mortgage on this and two other farms in favor of Nereo Pirazzi to secure a loan for $27,000, interest thereon up to the sum of $3,000, in addition to those guaranteed by law, and $800 for costs and fees in the event of foreclosure. "La Molina" estate answered for $23,000 principal, $2,500 interest, and the $600 credit for foreclosure. The mortgage was constituted for a period of four years which would expire on May 5, 1932, and the mortgagors were granted the right to four extensions of one year each as of the expiration, provided they had paid the interest due and the premiums of the insurance corresponding to the extension periods. It was agreed that the loan should bear interest at 10 percent annually, payable semiannually in advance. In the event of default in the payment of interest for two semesters in advance in the sum agreed upon, the entire indebtedness should become due and payable. It was also agreed that the debtors

would insure the coffee crop during the entire period of the mortgage and extensions thereof for a sum of not less than $20,000, and the failure to comply with this obligation would cause the expiration of the debt and the creditor would have the right to proceed to its collection. All of the foregoing was set forth in deed No. 61 executed in Ponce on May 5, 1928, before Notary Cipriano Olivieri. The mortgage was recorded in the Registry of Property on June 14, 1928.

On April 10, 1930, the mortgagors and creditor Pirazzi entered into a contract of antichresis in which, after reciting the previous mortgage, they stated, agreed, and bound themselves by the following covenants which we prefer to copy literally rather than to recite them, since such contract of antichresis and the covenants therein constitute the fundamental judicial fact which governs the issue in this action:

"FIFTH: Gerardo Jorge and Juana Rodríguez Morales declare that two interest semesters in the manner agreed upon, that is, in advance, and at the rate stipulated in the mortgage contract on the principal of TWENTY–THREE* DOLLARS for which property number two shall answer, have become due since the fifth day of May nineteen hundred and twenty-nine. These two semesters amount to the sum of ONE THOUSAND NINE HUNDRED SIXTEEN DOLLARS and sixty-seven cents.

"Likewise, two interest semesters at the rate and in the manner agreed upon in the mortgage on the principal of FOUR THOUSAND DOLLARS for which the property described under the number one shall answer, have become due.

"SIXTH: That the appearing parties, Gerardo Jorge Rodríguez, with the express consent of his wife Andrea Rodríguez, and Juana Rodríguez Morales, having agreed with the other appearing party, Nereo Pirazzi, to execute a contract of ANTICHRESIS on the properties described under numbers two and three, *in order that the latter may collect from each one what it yields or may yield in the future,* which will be specified hereafter, they hereby enter into such contract and in accordance with the following clauses:

---

* $23,000.

## FIRST

"GERARDO JORGE RODRÍGUEZ, with the express consent of his wife ANDREA RODRÍGUEZ, which she sets forth herein, and JUANA RODRÍGUEZ MORALES, hereby GIVE IN ANTICHRESIS to NEREO PIRAZZI the properties described above under numbers TWO** and THREE of this deed, for him to administer and to receive the income which the said two farms produce or may produce hereafter, and to apply such income to the payment in full in the following order:

"IN THE FIRST PLACE: Of the expenses of financing, cultivation, cleaning, and harvesting of the fruits from the farms described hereinabove under numbers two and three; expenses of repair of the establishments existing on those two farms, and expenses of construction of the buildings or structures· which may be necessary, in the opinion of Nereo Pirazzi, in any of the said farms; of the amount of the taxes due or to become due on those farms; of the expenses of execution and registration of this deed in the Registry of Property, including· any expenses incurred in this connection by Nereo Pirazzi; and any expenses incurred in rendering effective in practice each and every one of the clauses of this ·contract; premiums and expenses of insurance of any kind on the establishments, cultivation and crops of those two farms; interest at twelve· percent annually on the money furnished by Nereo Pirazzi for all .of these purposes.

"IN THE SECOND PLACE: After the expenses and obligations above referred to have been defrayed, the REMAINDER, if· any, shall be applied to pay in whole or in part, according to the amount thereof, the sum of ONE THOUSAND NINE HUNDRED SIX-TEEN DOLLARS and sixty-seven cents owed to Pirazzi for two semesters past due in advance, as set forth in the fifth paragraph of this deed.

"IN THE THIRD PLACE: After those and these expenses and obligations have been paid, the remainder, IF ANY, shall be applied to pay in whole or in part, according to the amount thereof, the interest due in the manner and at the rate agreed upon in the mortgage referred to above on the amount of TWENTY—

---

** Property No. 2 is "La Molina," which was also described in this document.

THREE THOUSAND DOLLARS for which the farm described under number two shall answer.

"AND IN THE LAST PLACE: After all the expenses and obligations referred to hereinabove have been paid in full, the REMAINDER, if any, shall be applied to pay in whole or in part (according to the amount thereof) the principal of TWENTY-THREE THOUSAND DOLLARS which encumbers the said farm number two.

## SECOND

"The term of this contract of ANTICHRESIS shall last during all such time as it may be absolutely necessary and indispensable to pay the total amount of expenses, interest, and credits mentioned in the preceding clause.

## THIRD

"On the THIRTIETH DAY OF JUNE and THIRTY-FIRST OF DECEMBER of each year NEREO PIRAZZI shall close the accounting entries in the book or books which he is bound to keep of the receipts and expenditures in the administration of the said two farms, and Gerardo Jorge Rodríguez and Juana Rodríguez Morales may examine them from eight in the morning until five in the afternoon of the said day in the offices of Pirazzi.

## FOURTH

"It is expressly agreed that Gerardo Jorge Rodríguez and Juana Rodríguez Morales may not recover the enjoyment of the two farms given herein in antichresis without first paying in full to Nereo Pirazzi the expenses, interest and credits referred to in the first clause of this deed. However, Pirazzi may compel the said mortgagors to enter at any time anew in the enjoyment and possession of the said farms or of either one of them.

## FIFTH

"The appearing parties, Gerardo Jorge Rodríguez and Juana Rodríguez Morales, hereby vest Nereo Pirazzi with express and irrevocable powers until the termination of this contract to borrow, in their name and representation, from Puerto Rico Hurricane Relief Commission, such amounts as the latter may

be willing to grant, Pirazzi being also expressly empowered by the said appearing parties to constitute in favor of said Relief Commission a mortgage to secure such loan on both or either of the two properties hereby given in antichresis and which are described under numbers two and three. The said persons further expressly empower Pirazzi to borrow in their name, from any banking institution, such sum or sums of money which he may need and to secure such loan by mortgage on the said properties.

## SIXTH

"Pirazzi may assign or transfer freely the rights and powers granted to him hereunder. On the contrary, if Jorge Rodríguez and Juana Rodríguez Morales wish to sell, and do sell, all or any of the said properties object of this contract, they shall serve notice on Pirazzi and they shall be bound to credit the proceeds of the sale or sales toward any amount of the mortgage referred to above and interest due thereon, in the manner stipulated herein, for which the farm or farms thus sold may answer.

## SEVENTH

"The contracting parties hereby expressly agree that this contract shall not be understood in any manner whatsoever as part, nor as a modification in any way, of the stipulations made in the mortgage referred to in the second, third, and fourth paragraphs of this deed, which shall continue in full force and effect as if this contract did not exist; nor shall this contract be understood in the sense of precluding Nereo Pirazzi in any manner whatsover from capitalizing the accrued interest in the manner agreed upon on the principal for which each of the two farms object of this contract shall answer, provided the yield therefrom is not sufficient to pay them in full. In other words, if the fruits are sufficient to pay only part of such interest, the unpaid remainder shall be capitalized. If they are not sufficient to pay any part of such interest, the latter shall be capitalized in their entirety.

## EIGHTH

"The appearing parties herein declare that the amount of ONE THOUSAND NINE HUNDRED SIXTEEN DOLLARS and sixty-seven

cents referred to in the fifth paragraph and in the first clause of this deed is not the full amount of the two semesters of interest due since May five nineteen hundred and twenty-nine, but rather the amount of those two semesters which Gerardo Jorge and Juana Rodríguez owe after Jorge made a payment for credit to the first of the two semesters.

## NINTH

"Any dispute which may arise between the contracting parties herein in connection with the performance of everything contained in this contract of antichresis, upon failure to reach an agreement shall be submitted to the decision of two amicable arbitrators, one of whom shall be designated by Nereo Pirazzi and the other by the other appearing parties; it being stipulated that in the event these amicable arbitrators are unable to reach an agreement, they may designate a third person to settle such disagreements, it being the express desire of the appearing parties, and they do so agree, that such disagreements shall not be submitted in any event to the courts of justice.

## TENTH

"It is further agreed that the heirs, successors, and assignees of the appearing parties in this contract shall be bound to respect each and every one of its clauses."

The foregoing covenants and clauses were subscribed by deed No. 21 executed in Ponce on April 10, 1930, before the said Notary Olivieri. The notary set forth that the contracting parties were instructed on §§ 1782 to 1787, 1761, and 1762 of the Civil Code, all of which were copied in the body of the deed. The contract of antichresis was recorded in the Registry of Property on May 6, 1930.

On March 6, 1931, while the contract of antichresis was in full force and without it having been rescinded, terminated or liquidated, and while creditor Nereo Pirazzi was in possession and enjoyment of "La Molina" estate by virtue of the said contract, he filed in the former District Court of Ponce civil case No. 5734 to foreclose summarily

the mortgage referred to above on "La Molina."[1] He brought the action against debtors Juana Rodríguez Morales and Gerardo Jorge and against the seven minor children of the latter because his wife Andrea Rodríguez had died. In the initial petition the creditor invoked as only grounds the nonperformance of the third and fifth clauses of the mortgage which vested him with the right to foreclose the same before its expiration for nonpayment in advance of two interest semesters and for nonpayment of the crop insurance. He alleged that the debtors owed $2,684 of interest for two semesters and that they had also failed to comply with the said fifth clause as to the insurance. He made reference to the constitution of the antichresis and attached a copy of the contract to the initial petition. He invoked the clause of that contract in the sense that the same should not be understood as a part or modification of the mortgage constituted. In view of the initial petition, on March 11, 1931 an order was issued ordering the debtors to pay the principal of $23,000, the interest as of *May 5, 1929* up to a sum of $2,500, and $600 for costs.

As a result of these proceedings, on June 2, 1931 creditor Nereo Pirazzi, while he was in possession, use, and enjoyment of the property by virtue of the contract of antichresis, adjudicated "La Molina" to himself at a public auction. As a result thereof and of the title acquired by Pirazzi at the judicial sale, which was reproduced in deed No. 57 of July 24, 1931, executed before Olivieri on August 15, 1931, the mortgage was cancelled by merger of titles and the contract of antichresis was also cancelled by merger of titles.

Nereo Pirazzi died under a will on March 16, 1934 while he was in possession of the farm, leaving as sole and universal heirs his children Josefina and Rafael Pirazzi, defend-

---

[1]The remainder of the mortgage credit secured by another farm had been assigned by Pirazzi to a third person and the latter had already foreclosed it on that other farm.

ants herein. In the distribution of the inheritance "La Molina" was adjudicated to codefendant Rafael Pirazzi in payment of his hereditary share by virtue of judgment rendered by the District Court of Ponce in an action on nullity and nonexistence of recognition and other particulars.

On December 19, 1955, mortgagor Gerardo Jorge and his seven children, as heirs of his deceased wife, and the heirs of the other mortgagor, Juana Rodríguez, brought this action against codefendants Josefina and Rafael Pirazzi, heirs of creditor Nereo Pirazzi. They prayed for the nullity of the mortgage foreclosure proceeding, the return of "La Molina" and of the fruits produced. The defendants answered the complaint separately; both denied the facts seeking the nullity of the mortgage proceeding; both raised certain special defenses, and both interposed identical counterclaims alleging that in the event of a declaration of nullity of the summary foreclosure proceeding and before they could be required to return and deliver the farm, plaintiffs should pay them the amount of $23,000 of the principal of the loan secured by mortgage, interest thereon at 10 percent annually as of May 5, 1929, and the sum of $500,000 as reimbursement of the value of the improvements made on the farm, the taxes paid, the expenses of preservation and administration, and the value of the services and of the time spent by defendants and their predecessor from the time they took possession of the farm as bona fide owners.

Subsequently defendant Rafael Pirazzi interposed an additional special defense alleging that in case No. 6321 of the former District Court of Ponce, brought by mortgagors Juana Rodríguez and Gerardo Jorge against creditors Nereo Pirazzi and Cipriano Olivieri in connection with the same facts involved in this action, the District Court entered judgment on May 10, 1933, dismissing the action for want of prosecution by the parties, which judgment became final and unappealable and has not been voided nor set aside and

which has between the parties the scope of res judicata. At the opening of the hearing of the case on the merits codefendant Josefina Pirazzi subscribed also to said additional special defense.

After extensive and detailed findings of fact based on a detailed analysis of the entire evidence, the trial court rendered judgment at law decreeing the nullity of the summary foreclosure proceeding, the nullity of the judicial sale of "La Molina" and of the title of creditor Nereo Pirazzi by virtue of such proceedings and judicial sale, the nullity of the transfer of the farm to codefendant Rafael Pirazzi in partial payment of his hereditary estate, the nullity of the pertinent registrations in the Registry of Property, and ordered the return of "La Molina" to plaintiffs. It held that plaintiffs owed to defendants the sum of $109,419.60 on account of the mortgage debt and interest thereon; that defendants owed to plaintiffs $312,541.11 on account of fruits and other particulars which were specified in its findings of fact, and in addition to the return of the farm it ordered defendants to pay to plaintiffs the difference of $203,030.51 for the credit balance in their favor, legal interest on this amount as of the date of the judgment, and $10,000 for attorney's fees.

Codefendants took separate appeals. In extensive assignments of error both attack vigorously the findings of fact and the conclusions of law of the trial court; both insist on the validity of the summary foreclosure proceeding; both assail the judgment in fruits against them even though such proceeding had been void. Notwithstanding the allegations of her counterclaim and her claims therein, codefendant Josefina Pirazzi further alleges, as respects the fruits, that she was not in possession of the property since 1935 when the same was adjudicated to her brother.

## Res Judicata

On October 5, 1931, Juana Rodríguez Morales *et al.*, as plaintiffs, filed in the former District Court of Ponce civil case No. 6321, on nullity, etc., against Nereo Pirazzi and Cipriano Olivieri, defendants. That record was not offered in evidence because it was not found. The trial court refused to admit evidence other than from its contents. However, defendants presented the evidence which they had available as part of a special record of evidence offered and unadmitted. From that evidence it appears that that action sought the nullity of the same summary foreclosure proceeding involved in the present action. There is in that record a certificate on the judgment rendered in the said action No. 6321 which provided verbatim: "Judgment.—This case having been inactive for more than one year since no action has been taken by any of the parties, which have failed to appear within the period of 10 days granted to allege the reasons why this case should not be dismissed, and in view of Rule 3 for the District Courts in Civil Matters, judgment is hereby rendered dismissing this action for want of prosecution by the parties, without special judgment of costs. Judgment rendered in Ponce, P.R., on May 10, 1933 and entered the same day, month and year.—I attest: (s) D. Sepúlveda, Judge, District Court."[1(a)]

Section 1204 of the Civil Code, 1930 ed., provides in part that only a judgment obtained in an action for revision shall be effective against the doctrine of res judicata; and that in order that the doctrine of res judicata may be

---

[1(a)] Rule 3 referred to in the judgment provided: "At the calling of the calendar at each regular term, the court, *motu proprio* and by previously notifying the parties at least five days before, may order the dismissal of any pending action, suit or proceeding wherein no progress has been made in their prosecution and entry thereof made in the record, for one year or more, due to the negligence of the parties, unless such delay is opportunely justified to the satisfaction of the Court."

successfully alleged in another suit, it is necessary that identity of things, causes, persons, and capacity exist between *the action decided* and the one in which the plea of res judicata is invoked. See §§ 59(2) and 62 of the Law of Evidence. Under the applicable law, the former judgment for want of prosecution of May 10, 1933, did not produce the effect of res judicata since it did not go to the merits of the action. *Vega et al.* v. *Rodríguez et al.*, 21 P.R.R. 318, 326 (1914); *Vives et al.* v. *Amorós Bros. et al.*, 34 P.R.R. 170, 176, 177 (1925); *Balasquide* v. *Luján*, 45 P.R.R. 548, 562 (1933); *Albizu* v. *Royal Bank of Canada*, 46 P.R.R. 487, 494 (1934); *Aguilera* v. *Pérez*, 51 P.R.R. 1, 3 (1937); *Insular Board of Elections* v. *District Court*, 63 P.R.R. 786, 796 (1944); *Muñoz* v. *Pardo*, 68 P.R.R. 569, 572 (1948); *García* v. *Government of the Capital*, 72 P.R.R. 133, 144 (1951); *Chabrán* v. *Méndez*, 74 P.R.R. 719, 732 (1953); *Fels* v. *Biascoechea*, 77 P.R.R. 644, 647, 648 (1954); *Bolker* v. *Super. Ct.; Sosa, Int.*, 82 P.R.R. 785, 793 (1961); *Pérez* v. *Bauzá*, 83 P.R.R. 213, 217, 218 (1961).

■ Appellant Rafael Pirazzi maintains that under Rule 41(b) of the Rules of Civil Procedure of 1943, the previous judgment had the effect of res judicata, since this action was brought while that Rule was in force and since it is a procedural matter it has retrospective effect. He is not right. Even though the question were merely procedural, which in our opinion it is not, *cf. Cintrón* v. *Yabucoa Sugar Co.*, 54 P.R.R. 493, 499 (1939), Rule 41(b) had its own effectiveness clause: to be applied to actions brought subsequent to September 1, 1943, and to subsequent proceedings in the cases pending on that date. *Berdecía* v. *Tyrrell*, per curiam decision (unpublished) of April 22, 1958; *Meléndez* v. *Cividanes*, 63 P.R.R. 4, 11, 12 (1944); *Capella* v. *Carreras*, 57 P.R.R. 250, 257 (1940). *Cf. Souchet* v. *Cosío*, 83 P.R.R. 730, 734 (1961); *Costas Purcell* v. *Superior Court*, 88 P.R.R. 10 (1963). A court could hardly make the reserva-

tion permitted by Rule 41(b) in a judgment entered prior to the adoption of that Rule. Appellant further maintains that the decision in *Heirs of Rosa* v. *Heirs of Jiménez*, 77 P.R.R. 521 (1954), impliedly reversed *Cividanes*. This is not correct. In *Heirs of Rosa* we said, which is correct, that a judgment for want of prosecution from which no appeal is taken should be regarded as final and conclusive. No question of res judicata was involved nor considered, aside from the fact that in that case the judgment of dismissal for want of prosecution was rendered on May 24, 1950, under the authority of Rule 41(b).

Even though the trial court had erred in not admitting extrinsic evidence on res judicata, *cf. Dávila* v. *P.R. Ry. Light & P. Co.*, 44 P.R.R. 923, 932 (1933), and conceding that the former action sought the nullity of the same foreclosure proceeding, as a question of law the defense of res judicata was untenable and the court did not err in denying it.

## The Nullity

The validity or nullity of the summary foreclosure proceeding in litigation in this case does not rest alone on those grounds which we ordinarily see in the cases decided, usually error or nonperformance in the proceeding itself or the wrong statement of the facts, which as a general rule have been decided in a question fundamentally of law. The additional statements of fact created in this case between the mortgagors and the mortgagee subsequent to the mortgage by reason of the contract of antichresis, which are closely linked with the mortgage as a means to obtain the collection of the debt, bring juridical facts on the validity or nullity of the proceeding which call for special treatment. In order to understand why the trial court decreed the nullity, it is necessary to pinpoint many of its findings of fact, the product of the documentary and oral evidence, including expert evi-

dence, as weighed and believed by the court where there was conflict of evidence.

According to those findings, at the time the mortgage was constituted, May 5, 1928, "La Molina" consisting of 264.25 cuerdas was devoted mostly to the cultivation of coffee and also truck gardening; it had 23 houses for squatters, a two-story storehouse, two glacises, dryers on tracks, and machinery for the processing of coffee. In crops prior to 1928 it had produced from 600 to 700 hundredweight of coffee from only 165 cuerdas cultivated.

For the year 1928 the coffee crop was estimated at from 600 to 700 hundredweight, and in that same year a purchase price of $60,000 was offered for the farm. Shortly after the mortgage was constituted, September 13, 1928, we were hit by the San Felipe hurricane. It destroyed much shade of the coffee plantation, a small part of the coffee trees and the plantations of vegetables, and caused damages to the houses of squatters, dwellings and storehouse. Despite the cyclone, in 1928 debtor Gerardo Jorge gathered about 200 hundredweight of coffee. In 1929, 100 hundredweight were gathered. The farm kept improving and in April 1930 there were many bananas, oranges and vegetables; the coffee plantation was in full bloom and there was much "millet," small berries on the coffee trees.

At the instance and offer of creditor Nereo Pirazzi himself, the parties entered into the contract of antichresis on "La Molina" and two other farms, copied at the outset, in order that Pirazzi *could collect* his mortgage credit from what each one produced or might produce in the future. At the time the contract of antichresis was executed, April 10, 1930, the debtors had paid the interest from the time the mortgage was constituted until May 5, 1929; they had not paid in advance the two interest semesters comprised between May 5, 1929 and May 5, 1930, amounting, at the rate of 10 percent, to $2,300. However, on that date this amount

had been reduced to $1,916.67 by virtue of a payment of $383.33 made by the debtors on account of the semester comprised between May 5 and November 5, 1929.

As a result of the contract of antichresis, Pirazzi entered the following day, April 11, 1930, into the material possession, use, and enjoyment of "La Molina" for all purposes of cultivation, operation and administration, without the debtors having thereafter any intervention in the possession, cultivation, operation and administration of the mortgaged property.

The court concluded that Nereo Pirazzi, mortgagee and also creditor in antichresis, received from April 10, 1930, the date of the contract of antichresis, to March 6, 1931, when he brought the summary foreclosure proceeding, the amounts of $6,000 for 200 hundredweight of coffee gathered, $1,880 for the sale of truck gardening and charcoal, $101 for grazing of cattle, and $56 for the rent of a house on the farm used as a school, making a total of $8,037. It further concluded that the money spent by Pirazzi during the same period, according to his books and account of antichresis, amounted to $4,575.16, but on the ground that they were not expenses proper of administration or to render effective the clauses of the contract as per deed, it eliminated the sum of $492.30 which included $35 for the purchase of a horse; $240 for the purchase of four mules from Gerardo Jorge; $23 for the purchase of an interest from a third person; and $194.30 for X rays and hospitalization of one Fernandini as a result of a personal quarrel. After eliminating the sum of $492.30, a balance of $4,082.86 of charges against the farm was left which, after being deducted from the income of $8,037.80, showed a balance of $3,954.14 in favor of the debtors at the commencement of the summary foreclosure proceeding. Considering the covenant of the contract of antichresis to the effect that the amounts to be furnished by the creditor in antichresis would earn interest at 12

percent annually, the trial court concluded that such interest in favor of Pirazzi on the expense items amounted to $241.04 which it deducted from the balance of $3,954.14, leaving a balance of $3,713.10. On the other hand, to the sum of $1,916.67 of interest owing at the time of signing the contract of antichresis the trial court added $1,150 interest for the semester from May 5 to November 5, 1930, and the amount of $766.67 interest from November 5, 1930 to March 6, 1931, the date of the foreclosure, making a total of $3,833.34 of interest owing. Applying the said debt of $3,833.34 against the balance in favor of the debtors of $3,713.10 produced by the farm, the court concluded as a question of fact that at the commencement of the summary foreclosure proceeding only $120.24 was owing on account of interest instead of $2,684 claimed in the initial petition or the $2,500 specified in the service of process; and it concluded as a question of fact that the mortgagee had made a false statement in his initial petition in alleging that two interest semesters in the amount of $2,684 were owing, without specifying which were the two semesters, when only $120.24 were owing, using that fact as a basis for the accelerated summary foreclosure of the mortgage, the principal of which had not yet become due.***

Andrea Rodríguez, wife of Gerardo Jorge, died on December 15, 1930, leaving as heirs her seven children, all of whom were minors on March 6, 1931. The court concluded that on that date debtor Gerardo Jorge and his children were living in a state of extreme poverty, two of his minor daughters, Luz Virginia and María Isabel being interned in the Home for Orphan Girls of Ponce. In January 1931 debtor Gerardo Jorge urged Pirazzi on several occasions to render him accounts of the administration of the farm pursuant to the covenant in the contract of anti-

***Any two interest semesters amounted to $2,600 only.

chresis, which accounts were never rendered despite the fact that upon the death of his wife the minors became mortgagors and acquired an interest in the antichresis. The accounts were never rendered and, on the contrary, on January 29 Pirazzi, through his attorney, demanded from the debtors full payment of the mortgage and interest thereon. The contract of antichresis was never liquidated nor rescinded, was never cancelled by the parties, and the creditor in antichresis never rendered accounts of the income from the administration, although he did keep in his books an account of expenditures, he never gave notice prior to the foreclosure that the farm did not produce fruits, nor at any time prior to the adjudication to him as owner by virtue of the summary foreclosure proceeding did he require the mortgagors to recover the possession, use and enjoyment of the farm.

The trial court determined that the creditor in antichresis Pirazzi did not pay the taxes on the farm, did not keep separate accounting books of the income and expenditures of his administration, but kept a so-called "account of antichresis" in his general accounting books in which he entered mostly the disbursements; that he did not close this account on June 30 nor on December 31, 1930, pursuant to the covenant; that some items for $1,888.28 which were credited in that account in favor of the debtors were entered after the commencement of the foreclosure and subsequent to the adjudication to him of the farm at the public auction within the summary proceeding. That in violation of the contract of antichresis, he did not insure the coffee crops for 1930 and 1931, subsequently alleging that fact as the second ground for the accelerated summary foreclosure of the mortgage before its expiration.

The above facts found by the trial court are substantially supported by the evidence in the record, as weighed

and believed by the trial court. There is no reason for disturbing those findings.

As to the proceeding itself, the court concluded that the initial petition did not specify categorically the exact amounts collected by way of interest or on account of the principal of the debt, nor specified the net amount of such interest by a liquidation or accounting of the movement or financial result obtained during the life of the contract of antichresis, nor how, when and where the antichresis was liquidated, terminated and rescinded, nor did it even state in connection therewith that no money had been paid on account of interest earned; that interest was claimed for $2,684 and demand was made for $2,500, when actually the amount owed was $120.24. That in the service of process the marshal did not certify that he demanded payment from Gerardo Jorge in his capacity of widowed spouse or of forced heir of Andrea Rodríguez, nor that he set forth in the returns of the service of process that he made the delivery or notice under his signature, the date and the place. That demand for payment was never made on Luz Virginia and María Isabel Jorge Rodríguez nor was notice served upon them. That at the time of the auction sale there existed a letter from the Collector of Internal Revenue according to which the taxes on the farm from July 1, 1929 to June 30, 1931 had not been paid, the debt on that account being $1,393.48; that only two of the copies of the initial petition delivered by the marshal were signed by the attorney for the foreclosing creditor; that none of the copies of the service of process delivered bore the signature of the clerk nor the official stamp of the District Court of Ponce. At the time of the auction sale and judicial adjudication to him, creditor Nereo Pirazzi held the material possession of the farm and operated it and continued in such possession until the moment of his death on March 16, 1934.

As respects the proceeding, the trial court was also of the opinion that the mortgagee collected through the summary proceeding interest which was not owing, and proceeded to the judicial collection of the debt notwithstanding the fact that he had bound himself not to resort at all to the courts of justice, and notwithstanding he had agreed that the contract of antichresis would be in force *during all the time which may be necessary and indispensable* to collect in full the interest and the principal of the debt; that taking into consideration all the foregoing circumstances, coetaneous with and subsequent to the contract of antichresis, together with its literal context, the real common intention of the parties and their primary purpose or objective in executing the same was to grant to the mortgagors a longer period, "during all such time as it may be absolutely necessary and indispensable to pay the total amount of the expenses, interest and credits" specified in the First clause of the contract of antichresis, and a safer and more efficient manner of paying in full the mortgage obligation by the possessory displacement of the farms in favor of Pirazzi in order that he could administer them and receive the income which such farms produced or might produce hereafter and to apply such income to pay in full the debt and other charges.

The court also concluded that as a result of the contract of antichresis the mortgagee waived collection of the mortgage debt by other means as long as the antichresis was in force and effect and the farms were maintained in fruitful condition. That not only was he willing to put off, as he actually did, the judicial collection of the mortgage, but he also bound himself "to finance the operation of the tenements advancing, without fixing any financial limit therefor (which his ruined debtors were unable to carry out), all the money necessary for: (a) expenses of financing, cultivation, cleaning and gathering of fruits; (b) expenses of repair of

the establishments; (c) expenses of construction of the buildings or structures which may be necessary; (d) to pay the amount of the taxes due or to become due; (e) expenses of execution and registration of the contract; (f) any expense for the purpose of rendering effective in practice each and every one of the clauses of the contract; and (g) premiums and expenses of insurance of any kind of the establishments, cultivation and crops of the two farms. In view of the importance of the farms and the damages caused by the hurricane, all those operations could entail disbursements greater than the mortgage debt itself. The creditor went so far in his liberality that he bound himself to capitalize the interest 'in its entirety', 'provided the fruits therefrom are not sufficient to pay them in full'; and he even went farther, he agreed that any disagreement that may arise 'shall not be submitted *in any event* to the courts of justice.' " (Italics in the original.)

In the light of the facts and circumstances surrounding the constitution of the contract of antichresis, the trial court, referring in its findings of fact to the seventh clause of the contract, set forth in the following manner that part of the clause in which the mortgagee and creditor in antichresis stated that the contract would not be understood as either a part nor as a modification in any particular of the stipulation in the mortgage constituted, which would continue in full force and effect as if such contract did not exist:

"The court interprets the first part of the SEVENTH clause of the contract of antichresis, relative to the nonmodification of the stipulations in the mortgage, in the sense that it constituted a reservation which the creditor wished to make in order to preserve against third parties and the mortgagors themselves the effectiveness of the mortgage security, so that at the proper time, in the event of rescission or termination by the parties of the contract of antichresis, or in the event of sale of the farms without paying him his credit, he could collect through mortgage foreclosure the balance of the principal debt

and interest thereon, for the payment of which the contract of antichresis was executed.

"The court interprets this clause together with the other covenants in the sense that he would not foreclose the debt for nonpayment of interest even if the fruits were not sufficient, because he bound himself to capitalize it. It also interprets it in the sense that Pirazzi considered that the mortgage obligation was unenforceable since April 10, 1930, as long as the antichresis was maintained in full force and in extinctive operation, in agreeing that in no event would he submit his debtors to the courts of justice and much less to the *ex parte* and confiscatory proceeding of distraint and auction sale to which a summary foreclosure proceeding is equivalent; and it also interprets it in the sense that he impliedly agreed not to foreclose the mortgage security for nonpayment of the insurance of the coffee crops, since he bound himself to advance any expense on account of premiums on the insurance, and that any violation of the mortgage contract, sufficient at law to proceed to its foreclosure, which the mortgagors might have committed by April 10, 1930, when the antichresis was constituted, was likewise remitted or waived."

On the basis of the findings of fact, the trial court was of the opinion that the provisions of the Mortgage Law and of the doctrine essential for the validity of a summary foreclosure proceeding had been violated, and it decreed in law the nullity of the proceeding in this case. We are also of the opinion that such summary foreclosure proceeding could not prevail in view of the attack on its nullity.

We turn to state the reasons for this conclusion, according to the applicable law, insofar as essential and in complete accord with the statement of law made by the court, although at times we may not absolutely agree.

█ The antichresis, a juridical relation much discussed and attacked by the canon law, particularly in the Middle Ages, which considered it a vehicle of usury, not admitted by *Las Partidas*, found in the long run a permanent place, even though it still has its detractors in §§ 1781 to 1786 of

the Civil Code, 1930 ed., as an accessory real contract of guaranty, but independent, with its own unmistakable characteristics, distinguishable from the mortgage and the pledge and similar contracts.

Section 1781 provides that by antichresis a creditor acquires a right to receive the fruits of real property of his debtor, with the obligation to apply them to the payment of interest, if due, and afterwards to the principal of his credit. Section 1782 provides that a creditor is obligated to pay the taxes and charges which burden the estate unless there is an agreement to the contrary, as well as to pay the expenses necessary for its preservation and repair. He may deduct from the fruits the sums which he may employ for such purposes.

When there is possessory displacement, because it has been said that the fact that the debtor places the creditor in antichresis in possession of the property is not an essential requisite for the validity of the antichresis—see Resolution of the General Directorate of the Registries of March 15, 1909—although that is its common characteristic, in the event of such displacement the debtor may not, according to § 1783, recover the enjoyment of the real property without first paying in full what he owes to his creditor, thereby recognizing to the latter a right of retention. On the contrary, according to the same section, in order to free himself from the obligations imposed on him by § 1782, the creditor in antichresis may always obligate the debtor to recover the enjoyment of the property, unless there is a covenant to the contrary.

As to the final disposition of the rights of the parties, § 1784 provides that the creditor does not acquire the ownership of the real property by nonpayment of the debt within the term agreed upon, and declares that any stipulation to the contrary shall be void. In other words, in the contract

of antichresis the Code prohibits, on pain of radical nullity, the contract of forfeiture. However, it grants to the creditor the right to recover and, as in the mortgage, it recognizes the *ius distrahendi* in permitting him to demand, in the manner provided by the Law of Civil Procedure, payment of the debt or the sale of the real property.[2]

[2] The Chancellor of the University of Murcia, Manuel Batlle Vázquez, offers us an interesting historical review of the evolution of the anti-chresis in his collaboration to *Nueva Enciclopedia Jurídica*, vol. II, p. 697 (1950), under the direction of Dr. Carlos E. Mascareñas. The question of whether the antichresis was a personal or a real right has been the object of discussion. There is no doubt any longer, at least in our civil law, that it is absolutely a real right and an independent contract, although of ancillary type. That is why, as stated by Roca Sastre in *Derecho Hipotecario*, vol. III, p. 33 *et seq.* (5th ed. 1954), the antichresis is a real right of enjoyment and at the same time of recovery of value, "in functions of guaranty *and of payment.*" He says: "It is true that the antichresis falls on the fruits, without conceiving the latter as elements separate and apart from the real property which produces them, but as integral and inherent parts. Also, the usufruct follows the fruits of a thing, but one law as well as the other attributes to the owner the *right to receive the fruits* from another's thing rather than isolatedly considered. The fruits—says Ennecerus—correspond to the creditor in antichresis, not by way of pledge, but of property. The creditor in antichresis acts with respect to them as if he were the owner of the thing which produces them. He may demand them by the *rei vindicatio* of a possessor in bad faith. The creditor in antichresis has the right to the natural and civil fruits; he takes the former for himself, that is, he acquires their ownership by separation, and the civil fruits by perception.

"Therefore, the constitution of an antichresis produces a transfer or displacement of a patrimonial value consisting in the right to enjoy a thing belonging to another. So much so that in our Civil Code the anti-chresis is considered as a business of disposition. Section 1781 of the same Code does not say that by antichresis a person *obliges himself* to trans-mit the right to receive the fruits, but 'that the creditor *acquires* the right to receive the fruits of real property.'" (Italics by the writer.)

See Resolution of the General Directorate of the Registries of June 30, 1913, according to which it is similar to the real mortgage contract, and the Resolution of March 11, 1932: "Whereas, dispensing with the nature much discussed in all the legislations—since the Roman—of the antichretic lien which is again looked upon with so much interest in the most advanced territorial credit countries, because it substitutes advantageously the several combinations of the mortgage and the usufruct —usufruct of security or guaranty—and even equating the antichresis, with the character of true property right, with the mortgage, by the deci-

520

██ ██ According to the record, it is clear that Pirazzi, as creditor in antichresis, never sought to free himself from the obligations of the contract of antichresis by requiring the debtors to recover the enjoyment of the property, § 1783. Far from there being a covenant to the contrary in this sense, there was an express covenant to that effect but no use was made of it. It is likewise true that Pirazzi, as creditor in antichresis, did not seek either to assert the right of demand granted to him by § 1784. As to this right of demand, in the first place the term of the debt had not expired, the contract of antichresis being on the other hand for an indefinite term; and, in the second place, he did not demand payment nor the sale of the real property on the authority of the Law of Civil Procedure. The only remaining conclusion to be drawn from the record is that Pirazzi proceeded to collect summarily the mortgage debt for non-performance of the conditions which permitted an accelerated foreclosure without the same being due, in utter disregard

---

sions of this Directorate insofar as it also presupposes, apart from the characteristic right to receive the fruits, *a potential alienation of the ownership of the real property*, the present case deals essentially with the interpretation of the testator's will." (Italics ours.)

Valverde does not sympathize with this contract precisely because, notwithstanding it is a contract of guaranty, it is also of *disposition* and the debtor loses the ownership of the real property, and, being a real right, it constitutes an obstacle for the alienation of the property by the debtor. Also, he believes that it lends itself to usury. III *Tratado de Derecho Civil Español* 729 (4th ed. 1937).

In the study of antichresis appearing in 29 Mucius Scaevola, *Código Civil* 561 *et seq.* (1955), commented and conformed at length, drafted by Pedro de Apalategui, it is said that the definition of the Code is not complete because one of the characteristics of the law of antichresis is the *dispossession* of the real property for the debtor and that the tenements be fruitful. The characteristic that the tenements be fruitful, it is said, is institutional because it is precisely with the fruits that the cancellation of the obligation is sought. And it is commented that a *real* right has not arisen until the property passes to the hands and *possession* of the creditor. Once the creditor takes possession of the real property, his right to operate the tenement accrues and can only be waived *by delivering the thing* to the debtor.

of the contract of antichresis and in open violation of the obligations which he assumed thereunder, and also because they were protected by the record of the Registry, because the antichresis was recorded in the Registry. Compare Judgments of the Supreme Court of Spain of October 16, 1916, and June 23, 1908. Not only did he ignore the antichresis, but he also made use of the omission of facts which he was bound to perform under the contract of antichresis in order to impute such omission to the debtors as only ground for the accelerated summary foreclosure.

We agree, as being entirely logical, with the interpretation placed by the trial court on the first part of the Seventh clause of the contract of antichresis, especially if we consider that when the contract of antichresis was executed, April 10, 1930, the mortgagee was in a position to foreclose because two interest semesters had not been paid in full in advance. What is more, according to the record the contract of antichresis, by its covenants and agreements, did not represent merely an additional guaranty to the mortgage lien, but the same was executed, according to the clear will of the parties set forth therein, as an effective and efficient vehicle to enable the creditor to collect his obligation. Hence, not only the possessory displacement but also the broad and extraordinary powers and prerogatives reserved by the creditor in antichresis, slightly less than those of the full dominion of the owner—we would say that all with the exception of the strict prerogative of alienation—in order that the contract of antichresis would be most effective and safe as such vehicle for collection of the debt by the operation and administration of the tenement.

Perhaps we would not agree entirely with the trial court in the sense that the contract of antichresis deprived the creditor of every judicial action, even though he did not return the possession. Compare the Judgment *supra* of

June 23, 1908. See *Bonet v. Heirs of Hernáiz*, 49 P.R.R. 96 (1935).[3] We could agree with appellants that Pirazzi could have brought a judicial action for collection. But such action should have been ordinary, in the manner provided by the Law of Civil Procedure, in which the administration of the antichresis could also be liquidated with the intervention and hearing of the debtors and after rendering accounts of the fruits produced, jointly with the action for collection.[4]

What the creditor could never do consistent with the pertinent provisions of the Mortgage Law, in view of the antichretic covenants and agreements, was to resort to the summary proceeding without first liquidating the income or determining the nonexistence thereof. Particularly since the principal of the debt had not become due and the foreclosure was accelerated for nonperformance of the obligations which the creditor in antichresis rather than the debtors was bound to discharge; and since he also invoked, for the summary

---

[3] In *Bonet* the contract of antichresis was executed two years after the *principal* of the mortgage debt had become due, and the judicial action for collection was an ordinary rather than a summary action. Although the judicial action was sustained, it was made clear that it was the creditor's obligation to render accounts of the administration of the real property for all the time he had it in his possession.

[4] As may be observed in Scaevola, *op. cit. supra* at 567 in connection with the antichresis, although the financial management of the tenement corresponds to the creditor, the debtor is not nor should be alien to such management, since his debt may be cancelled or greatly reduced, for example, by a good agricultural administration. The logical thing is to harmonize the interest of the creditor who holds the possession and that of the debtor with the principles of equity, which in conclusion are the general principles of law. It is further stated that there is recognized to the creditor the capacity of economic director of the management as derived from his right to possess and to receive the fruits, but the right of the debtor to object to certain detrimental acts cannot be ignored by resorting to the judicial authority. Further: "The Code is silent on the right of fiscalization of the debtor in antichresis, but it is necessary to consider this right as *embedded in the very core* of the institution under consideration [antichresis], and it must be recognized at all times of the agricultural or industrial cycle of the real property . . . *and this net result being known, to diminish the obligation accordingly, since this is the play of the antichresis.*" (Italics ours.)

foreclosure, the nonpayment of certain interest, the demand for collection of which depended in turn on the recovery of certain income produced and received by the creditor himself as operator of the tenement; because, as pointed out by Roca Sastre, citing Ennecerus, the antichresis has *function of payment*, and the creditor receives the income as his property, not as a guaranty, and as if he were the owner.

Section 169 of the Mortgage Law Regulations provides in connection with the summary proceeding that the initial petition shall enumerate the facts and the legal reasons supporting the correctness, the subsistence and the demandability of the claim and the jurisdiction of the court; *it shall specifically state the exact amounts collected by way of interest or on account of the principal of the debt*, stating also the net amount of the claim which by the mere act of instituting the proceedings the creditor will contract, assuming liability for any loss or damage that the debtor or interested third persons may suffer through *malice or negligence in not making a true statement of facts and of the circumstances which the judge must take into consideration* in authorizing the institution of the proceedings and continuing them. Section 175 of the same Regulations provides that the summary proceedings cannot be suspended by incidental issues or any other issues raised by the debtor . . . except in the cases enumerated therein; and that any other claims that may be brought either by the debtor or by third persons in possession and other persons interested, including those involving the nullity of the title *or of the proceedings*, or the maturity, *truth*, extinction or *amount of the debt*, shall be heard in the proper plenary action, without ever producing the effect of suspending or interfering with the execution proceedings.

In *Ríos* v. *Banco Popular*, 81 P.R.R. 368 (1959), this Court stated as follows at p. 374: "In view of the privileged position of the foreclosing creditor in the mortgage action,

the precepts contained in arts. 38 and 169 *supra* consist in an absolute imposition of the duty to state the truth with respect to the facts and circumstances to be weighed by the judge for the purpose of authorizing the summary proceeding . . . . In other words, the foreclosure proceeding will continue its ordinary course even though the debtor is able to show the inaccuracy or falsity of the facts alleged in the initial petition. That is why the law requires the foreclosing creditor to tell the truth when stating the facts in the initial petition. The 'malice or negligence' referred to in said art. 169 of the Mortgage Regulations refers both to the concealment or falsity of the reality, knowingly, and to incorrectness through error of law or through negligence in the investigation of the facts stated in the initial petition . . . . We have so repeatedly declared in holding: (1) that it is necessary to comply strictly with the procedures and requirements of the summary proceeding, thereby rendering null and void the acts performed by deviating therefrom; and (2) that the collection of excessive interest or other amounts not secured by mortgage is a substantial error, to the prejudice of the debtor's rights, which renders void the foreclosure proceeding instituted, even though such illegality is due to a mere error of law or to mere negligence in the investigation of the facts alleged in the initial petition." (Citation of cases.)

In *Heirs of Ramírez* v. *Super. Ct.*; *Del Moral, Int.*, 81 P.R.R. 347 (1959) (on reconsideration), we stated a similar view and added at p. 353: "It is not incumbent on the judge to investigate or determine the accuracy or falsity of the acts alleged in the initial petition to authorize the summary proceeding. Such responsibility falls entirely on the foreclosing creditor. Nor is it necessary in order for the proceeding to be void that the conduct of the foreclosing creditor be equivalent to deceit."

■ Here the conduct was more violative than the mere error or neglect or mistake pointed out in our decisions. Not only was there nonperformance in the formalistic sense of the statement of the initial writing, but in the substance there was a false or at least negligent, if not malicious, statement and concealment of the facts which gave rise to the service of process in an accelerated foreclosure. The evidence showed, as to the concealment, that the farm held by the foreclosing creditor had produced income from which the creditor could collect the interest, and it was not correct that the amount claimed on that account was due. No mention was even made of the payment of interest of $383.33 toward the semester of May 5, 1929, recognized by the creditor in the Eighth clause of the contract of antichresis, which represented a double collection of that amount. There was also a statement which was knowingly false in the initial petition as to the second ground of the accelerated foreclosure—failure of the debtors to insure the crops—which obligation corresponded to the creditor himself. See our expressions on the duty to be truthful and not to commit falsity, on pain of nullity of the proceeding, in *Cayol* v. *Balseiro Georgetti*, 3 P.R.R. 331, 343; *Martorell* v. *Crédito y Ahorro Ponceño*, 42 P.R.R. 632, 638 (1931); *Ayala* v. *Flores*, 50 P.R.R. 832, 839 (1937), citing from *Ojeda* v. *Registrar*, 39 P.R.R. 219 (1929); *Figueroa* v. *Boneta*, 58 P.R.R. 811, 813 (1941); *Salas* v. *Cabassa*, 69 P.R.R. 423, 430 (1948). Compare *Miranda* v. *District Court*, 41 P.R.R. 616, 620 (1930), with the situation in the case at bar, where we held that a mortgage bond to secure a lease could not be executed through the summary proceeding without first liquidating the guarantor's liability, and that such liability could not be determined in the summary proceeding. *Costas* v. *G. Llinás & Co.*, 66 P.R.R. 688, 695 (1946), and cases therein cited; *Buil* v. *Banco Popular*, 69 P.R.R. 237, 246

(1948); *Pizá Hermanos* v. *Alfaro*, 7 P.R.R. 105, 109; *Pontón* v. *Sucrs. of Huertas González*, 42 P.R.R. 511, 517 (1931).

The trial court rendered judgment correctly in setting aside the summary foreclosure proceeding brought by Nereo Pirazzi whereby he became the owner of "La Molina."[5]

## The Fruits

From a detailed analysis of the evidence presented, as weighed, settled and believed by the court, it concluded that the 264.25 cuerdas of "La Molina" were all arable, the *Múcara* and *Catalina* soils were deep and with drainage facilities, and were suitable and very fertile for the cultivation of coffee; the location and topography of the farm afforded good protection against cyclones and strong winds, and it was located in a zone having pluvial precipitation; that until 1953 it had 165 cuerdas of coffee under cultivation and after that year 220 cuerdas; the farm has always had machinery, storehouses and facilities for the processing of coffee with easy access to the local market. Truck gardening has also been harvested on the farm; it has a dam from a spring which distributes the water by gravity; it has its own aqueduct and interior roads which facilitate the cultivation and gathering of the crops.

It concluded that its average annual production of coffee has or should have been three hundredweight of coffee per cuerda and in productive years it could have been from 5 to 6 hundredweight. In bananas and truck gardening it has produced or should have produced a net income between

---

[5] In its conclusions of law the court stated other reasons of nullity, among them, the defects in the procedure of the service of process by the marshal; in the service of process papers; no demand for payment was made on two of the debtors who were minors; that the creditor could not acquire the property because he had the same under his administration, because of the prohibition of § 1348 of the Civil Code, and other particulars. We need not discuss and express our views on these other particulars, since according to the grounds of nullity considered above the validity of the foreclosure could never prevail.

$1,500 and $2,000 a year, and in oranges between $200 and $250, and it has produced much vegetable charcoal. Most of the coffee plantations were planted before the San Felipe hurricane. In 1935 the farm was in poor condition, yet codefendant Rafael Pirazzi, who took material possession of the farm at the beginning of the crop of that year, harvested 499.46 hundredweight of coffee from 165 cuerdas, or more than three hundredweight of coffee per cuerda cultivated. That "La Molina" has been classified as one of the best 10 coffee farms of Puerto Rico, codefendant Pirazzi having appraised the same at $200,000. In 1948 and 1949, 500 hundredweight of coffee out of 165 cuerdas under cultivation were insured against hurricane; 650 were insured in 1951, about four hundredweight per cuerda; in 1953, 550 hundredweight were insured; in 1955, 700 hundredweight or more than three hundredweight per cuerda were insured out of 220 cuerdas in production.

In the light of those facts and of the expert evidence presented on the average price of coffee in the market from 1928 to 1956, the cost of one hundredweight of coffee, including all expenses from the cultivation until placement in the market, the costs and values shown by the evidence to which the court gave credit, including the statement of payrolls made under oath, the court concluded on substantial basis in the record that the income from coffee produced or which should have been produced by "La Molina" from June 2, 1931, the date of the auction sale, until December 31, 1956, after deducting the expenses, was $257,824.03. (This amount should be corrected to read $257,120.99.)[6]

---

[6]

| "YEARS | HUNDRED-WEIGHT | PRICE PER HUNDRED-WEIGHT | PRODUCED | EXPENSES | PROFITS |
|--------|----------------|-------------------------|----------|----------|---------|
| 1931 | 300 | $30.00 | $ 9,000.00 | $ 2,400.00 | $ 6,600.00 |
| 1932 | 300 | 17.00 | 5,100.00 | 2,400.00 | 3,100.00* |
| 1933 | 300 | 17.00 | 5,100.00 | 2,400.00 | 3,100.00* |

The court further concluded that as a result of the coffee subsidy during the years 1939, 1940 and 1941 appellants received an income of $4,950 for those three years; that "La Molina" produced or should have produced, according to the evidence, not less than $1,500 annually of bananas, or $39,000 for all the years involved, and not less than $200 a year of oranges, or $5,200. From 1939 to 1955 they also received by way of compensation, reimbursements for fertilizer, practices, etc., the amount of $5,477.08 which added to $257,824.03 ($257,120.99) received from coffee total $312,451.11 ($311,748.07) of income. From this sum of $311,748.07 there should be deducted the sum of $3,160.50 which according to the accounts of the executorship of Nereo

| 1934 | 300 | 17.00 | 5,100.00 | 2,400.00 | 3,100.00* |
| 1935 | 499.46 | 13.00 | 6,492.98 | 3,054.71 | 3,438.27 |
| 1936 | 495 | 16.00 | 7,920.00 | 3,296.07 | 4,623.93 |
| 1937 | 495 | 16.00 | 7,920.00 | 3,755.53 | 4,164.47 |
| 1938 | 495 | 16.00 | 7,920.00 | 4,048.62 | 3,871.38 |
| 1939 | 495 | 16.00 | 7,920.00 | 2,460.83 | 5,459.17 |
| 1940 | 495 | 18.00 | 8,910.00 | 2,369.23 | 6,540.77 |
| 1941 | 495 | 18.00 | 8,910.00 | 3,749.98 | 5,160.02 |
| 1942 | 495 | 25.00 | 12,375.00 | 3,306.71 | 9,068.29 |
| 1943 | 495 | 25.00 | 12,375.00 | 5,045.40 | 7,329.60 |
| 1944 | 495 | 25.00 | 12,375.00 | 5,336.88 | 7,038.12 |
| 1945 | 495 | 30.00 | 14,850.00 | 4,916.72 | 9,933.18* |
| 1946 | 495 | 30.00 | 14,850.00 | 7,176.57 | 7,176.57* |
| 1947 | 495 | 35.50 | 17,562.50 | 9,075.05 | 8,487.45 |
| 1948 | 495 | 35.50 | 17,562.50 | 6,991.91 | 10,570.59 |
| 1949 | 495 | 35.50 | 17,562.50 | 7,273.42 | 10,289.08 |
| 1950 | 495 | 50.00 | 24,750.00 | 9,405.07 | 15,344.93 |
| 1951 | 495 | 52.00 | 25,740.00 | 9,281.46 | 16,458.54 |
| 1952 | 495 | 52.00 | 25,740.00 | 7,872.69 | 17,867.31 |
| 1953 | 495 | 55.00 | 27,225.00 | 9,852.97 | 17,372.03 |
| 1954 | 495 | 63.00 | 30,180.00 | 11,454.53 | 18,725.47 |
| 1955 | 660 | 54.00 | 35,640.00 | 12,272.57 | 23,367.43 |
| 1956 | 660 | 63.50 | 41,910.00 | 12,272.57 | 29,637.43 |

$257,824.03"

*A mathematical error was committed in the subtraction of these items. The last item of $257,824.03 should read $257,120.99. In returning the mandate, these facts should be taken into account in the foreclosure proceeding.

Pirazzi, covering the period from March 17, 1934 to October 4, 1935, when he rendered the final account, represents expense items identified with "La Molina" farm, leaving a balance of $308,587.57 of income.[6(a)]

As is natural in such cases, the evidence of both parties was conflicting as to the income. According to the oral testimony of appellant Rafael Pirazzi, the farm produced less coffee and there were greater expenses and costs. Apart from his testimony, appellant did not offer any documentary evidence, which presumably there was, in support of his testimony, such as records of production, wages paid, almuds gathered, records of sales, liquidation of the coffee, contracts and any other similar documentary evidence. Nor did he produce the testimony or the records of third persons with whom he negotiated the production of the farm. The trial court settled the conflict in the evidence to this effect, made a careful analysis thereof; its weighing and inferences of the expert evidence are reasonable, and its findings, regardless of the conflicting criteria, are substantially and preponderantly supported by the record. We have no reason to disturb its findings of fact on the matter. *Cf. Costas* v. *G. Llinás & Co., supra* at 698 *et seq.*

The court determined that as expenses of conservation and improvements, according to the evidence under consideration, there were paid $6,133.99 of property taxes, including the amount due at the time of the auction sale and up to June 30, 1956; $5,028.48 for fertilizers used since 1941, taking as a basis 25 tons annually at a cost of $46.56 per ton, plus the government contribution for fertilizers; $2,500

---

[6(a)] Plaintiffs objected to this evidence on the ground that they were not a party to the executorship and did not have an opportunity to challenge those items. Technically they could be right, but since the accounts were rendered to a court by an executor prior to the initiation of this action, we are of the opinion that those expense items should be taken into account.

for the cost of reconstructing the residential house of the farm; and $12,454.13 of premiums on the coffee insurance, making a total of $26,116.60. The court concluded that defendants therein did not offer any evidence on the cost of other improvements, works and repairs. *Cf. Nogueras* v. *Muñoz*, 67 P.R.R. 413, 421 (1947), where we said, under similar circumstances, that a defendant had the right under § 384 of the Civil Code to be reimbursed for the expenses necessarily spent for the preservation of the farm, but that the defendant had the burden of proof to show clearly and in detail exactly how the money was spent and why it was necessary or desirable to do so. In view of the general nature of the evidence in that case and the conflict in the evidence, the claim was disallowed. See *Concepción* v. *Latoni*, 51 P.R.R. 547 (1937), where we said at p. 562, "It is true that the plaintiffs were bound to prove their affirmative averment with regard to the amounts actually received by the defendant as rent. But it is also true that the defendant, as possessor of the properties, was in a better position than the plaintiffs to know what the properties produced during the time that he was in possession. Being in a position to assist in clearing up the truth, by appearing before the court and testifying on the facts, he preferred not to do so."[6(b)]

---

[6(b)] As to the necessary expenses paid for wages and personnel, the trial court stated that it took them from the annual payrolls submitted under oath in the name of appellant Rafael Pirazzi to the State Insurance Fund from 1935 to 1956, which documents constitute plaintiffs' Exhibit 67. As to the years 1931 to 1934, it based its determination on the average cost of $8 per hundredweight of coffee, covering from the time of its cultivation until it was placed in the market, according to the expert and nonexpert evidence which it had under consideration and to which it gave credit.

Appellant Rafael Pirazzi complains of the findings of the trial court as respects the yield from the farm, its expenses and income, and challenges the award for fruits in the belief that even though the latter were proper they should have been allowed in a smaller sum.

The situation revealed by the record as to appellant's position is his oral evidence—particularly in the absence of the other oral and documentary evidence available there, according to the record, that he was in a

To the previous item of $26,116.60 of expenses for preservation and improvement the court added $83,303 on account of the principal of $23,000 and the interest due at the rate of 10 percent up to May 5, 1957, the total obligation of the mortgagors at that time being $109,419.60 which it declared extinguished and compensated insofar as it concurred with the fruits to be returned. Sections 1149 and 1156 of the Civil Code. *Cf. Fuentes* v. *Aponte,* 63 P.R.R. 187, 191 (1944).[7]

The court concluded as a question of law that appellants, as sole and universal heirs of foreclosing creditor Nereo Pirazzi, were bound solidarily to return "La Molina" farm and the fruits received or which should have been received in excess of the mortgage debt. It was of the opinion that defendants, as heirs responsible for the obligations of their predecessor, did not have the status of bona fide possessors and acquired the properties of the inheritance subject to the obligations contracted by the predecessor.

█ Appellants' main contention before this Court is that even if the proceeding were void, as has been actually concluded, they are not bound to return the fruits, relying vigorously on § 371 of the Civil Code, 1930 ed., which provides:

"Any person who succeeds by hereditary title shall not suffer the consequences of a faulty possession of the testator, unless it be shown that he was aware of the defects affecting such possession; but the effects of possession in good faith shall benefit him only from the date of the decease of the testator."

---

position to produce and did not produce—does not provide that degree of persuasion and conviction required to set aside, on appeal, the findings made by the trial court in the light of the preponderance of the expert and nonexpert evidence. That situation precludes us from concluding that the findings on the fruits made by the trial court are without substantial support in the record, or even if it has any, that they are contrary to a more rational balance of the entire evidence submitted by both parties.

[7] The interest computed covers up to May 5, 1957. The judgment, however, was rendered on May 28, 1957. The necessary adjustment must be made in favor of appellants.

The preceding provision of the Code is based on the premise of a faulty possession of the testator. In ordinary circumstances we would have to decide that the possession of testator Nereo Pirazzi between the date the farm was adjudicated at a public auction and his death could be but a faulty possession, without good faith and just title, in view of the nullity of the summary foreclosure. The problem would then narrow down to determining whether the appellants, who acquired by hereditary title, would have to suffer or not the consequences of that faulty possession as of the death of the testator, all depending on a showing that they had or had no knowledge of the defects which affected it. On this point, both parties offer us an elaborate and reasoned discussion in their briefs supported by citations of authorities and of case law, appellants in an attempt to show that their possession was not faulty, and appellees that it was faulty with respect to the obligation to return the fruits.

If we had to decide the question as it has been raised, perhaps we would have to conclude from the disclosures of the record that appellants had sufficient knowledge of the defects which would have affected the possession derived by their predecessor as a result of the summary proceeding. There are several facts in the record which would permit such a conclusion. The most important one of them, that the contract of antichresis was recorded in the Registry with effect *erga omnes* of its covenants and agreements, and did not appear to be cancelled on the date the proceeding was brought.[8]

---

[8] Also, it has been said already that appellants were sole testamentary heirs, but the adjudication of "La Molina" to Rafael Pirazzi was the result of an inheritance suit between the brothers. The distinguished attorney who represented him in that and in this action testified that when the time arrived for determining whether or not he should accept "La Molina" in payment of the credit of his client Rafael Pirazzi, he examined the Registry personally, and according to his determination:

However, in view of the peculiar situation presented by the facts of this case, the question of the faulty possession or not of the predecessor and then of appellants as heirs, comes within another aspect of the applicable law. We are of the opinion that § 371 of the Civil Code does not govern this issue and we turn to consider the reasons.

The summary proceeding brought by creditor Nereo Pirazzi having been declared null and void, the auction sale and the deed of judicial sale whereby Nereo Pirazzi acquired and recorded the ownership of "La Molina" as owner were nonexistent in law. The proceeding being nonexistent, the

". . . he could accept the Molina farm without any risk because, in my opinion, the Registry did not disclose any defect of nullity nor the existence of any lien which could affect Pirazzi's title to that farm. Since the Registry disclosed that the title of Nereo Pirazzi had been acquired by mortgage foreclosure, I examined the mortgage foreclosure proceeding in the former District Court, now Superior Court of Ponce, and as an attorney I concluded that the foreclosure proceeding had been validly prosecuted and that Nereo Pirazzi had acquired a good title to the farm foreclosed, notwithstanding it appeared from the Registry of Property that Nereo Pirazzi and the defendants, i.e., the mortgagors, had entered into a contract of antichresis and that the farm had been foreclosed after the contract of antichresis was executed. The title adjudicated in the foreclosure was duly recorded in the Registry, from which it appeared that all the interested debtors had been summoned or notified personally." "MR. PIERLUISI: Just one question. Did you read the deed of antichresis? —MR. MARTÍNEZ RIVERA: Well, I read the record. A copy of the deed of antichresis appeared in the record of the mortgage foreclosure; the conditions of the antichresis also appeared from the Registry.—MR. PIER-LUISI: In the Registry you saw all the conditions of the antichresis?— MR. MARTÍNEZ RIVERA: Yes, sir.—MR. PIERLUISI: And in the record of the foreclosure proceeding?—MR. MARTÍNEZ RIVERA: Yes, sir. What is more, I recall that Mr. Olivieri told me that an action seeking the nullity of the mortgage foreclosure had been brought, and explained to me how that matter had ended, and no entry of nullity of the mortgage foreclosure appeared from the Registry.—MR. PIERLUISI: So, I must take it that you have had to examine that deed of antichresis in full detail, that is, the deed which was attached to the record of the mortgage foreclosure.—MR. MARTÍNEZ RIVERA: Yes, sir, I examined the entire record before advising Rafael Pirazzi to accept the farm."

The trial court stated as to this particular that defendants also had in their possession the books of the deceased which they could examine, and that Rafael Pirazzi was an accountant, experienced in the matter.

things were juridically placed in the same situation as they were at the commencement of the proceeding. See *Fuentes* v. *Aponte*, 62 P.R.R. 694, 701 (1943), "the judgment setting aside the foreclosure proceedings had the legal effect of setting aside *ab initio* the ownership title acquired by Fuentes and of restoring the *status quo* prior to the rendering of the judgment in said foreclosure proceedings. In contemplation of the law, Aponte never forfeited his right to the enjoyment and use of the property."

The mortgage debt as well as the obligations of the debtors preserved their legal effect and the entry of cancellation of the mortgage by merger of titles therefore lost its juridical effect. *Costas* v. *G. Llinás, supra* at 703, and *F. Rodríguez Hnos.* v. *Aboy*, 66 P.R.R. 498, 520 (1946). Similarly, the proceeding being nonexistent, the entry in the Registry of the cancellation of the contract of antichresis by merger of titles made as a result of such proceeding was rendered ineffective. Consequently, the contract of antichresis preserved all its juridical efficacy.

Considering that the foreclosing creditor was in the legal possession of the real property foreclosed by virtue of the contract of antichresis at the commencement of the proceeding and at the time of the auction sale and of recording his alleged dominion title, and that such sale and title being, as they were, nonexistent, *strictissimi juris* his possession upon his death was not faulty since it was derived from the contract of antichresis which never lost its efficacy. The civil possession inherited by appellants by the act itself of the death of the predecessor therefore partook of like nature.[9]

---

[9] Section 369 of the Civil Code provides that the possession of hereditary property is *regarded as transferred* to the heir *without interruption and from the moment of the death of the testator*, in case the inheritance be accepted, and that any person who *rejects* an inheritance in a valid manner is considered as never to have possessed the same.

On the other hand, § 360 provides that *natural* possession is the holding of a thing or the enjoyment of a right by any person, and the

The obligation to return "La Molina" which the trial court imposed on appellants, whom at some time it regarded as possessors in bad faith as a result of the nonexistent summary proceeding, is based in strict law by reason of their duty as heirs to comply with the obligations of their predecessor with respect to the covenants and agreements of the antichresis. These obligations were not extinguished, as maintained by appellants, either by the death of debtor Andrea Rodríguez, wife of Gerardo Jorge, or by the death of the predecessor. *Cf. Silva* v. *John Doe*, 75 P.R.R. 198, 204 (1953), and cases therein cited. In addition to the fact that § 1209 provides that contracts shall only be valid between the parties who execute them *and their heirs*, except, with regard to the latter, where the rights and obligations arising from the contract are not transmissible either by their nature or by agreement, or by provision of law, in this case there was an express covenant in the contract of anti-

---

*civil* possession is the same holding or enjoyment *joined* to the intent *of holding the thing or right as one's own.*

According to § 362, the possession of property may be considered in the aspect of owner, or in the holder of the thing or right to keep and enjoy it, *the ownership belonging to another person.* See §§ 599 and 601.

Under the antichresis, Nereo Pirazzi held the natural possession mentioned in § 360, similar to the possession of the lessee, and he transmitted it to his heirs. On this point, professor Guillermo G. Valdecasas comments in his work *La Posesión*, p. 41 (1953), that the heir acquires by operation of law, without the need of any material act, the possession held by the predecessor at the time of his death, provided the heir does not reject the inheritance. The ownership right, *"ius possessionis,"* is transmitted, and the possession acquired by the heir *is the same as that of the predecessor*, in the belief that he is owner *or in another capacity.* Sánchez Román holds the same view in *Derecho Civil*, vol. 3, p. 471 (2d ed.).

It could be argued that if sufficient fruits are produced to offset the mortgage debt, thereafter appellants held the possession in bad faith— *cf. Lluberas* v. *Mario Mercado e Hijos*, 75 P.R.R. 7, 14 (1953)—the case of a lessee who held the natural possession and did not return the property at the expiration of the contract. This notwithstanding, it would not affect the final disposition of the fruits nor render applicable § 371; since in such event the faulty possession of appellants would be per se and not by inheritance.

chresis recorded in the Registry which bound the heirs of the parties. The Tenth clause provided that the heirs, successors, and assignees of the appearing parties were bound to respect each and every one of the clauses. As heirs of the obligations of their predecessor, the appellants are bound solidarily. *Morales* v. *Cabrera*, 53 P.R.R. 90, 98 (1938). Sections 957, 599 and 601 of the Civil Code. What has been said disposes of Josefina Pirazzi's particular contention to the effect that she is not liable, since as of 1935 the possessor was her brother, independently of any hereditary agreement between them.

The evidence having shown that "La Molina" produced sufficient fruits and in excess to pay the mortgage debt and other expenses agreed upon, appellants are under the duty to return, together with the farm, the excess of the fruits to those who, the summary proceeding being void, never ceased to own the property.

■ Appellant Rafael Pirazzi maintains that he has the right to collect certain substantial amounts for his services in tending the farm. The contract of antichresis did not grant such right to Nereo Pirazzi. Even outside the contract, once he is considered as possessor in bad faith, he would not have that right either. *Cf. García* v. *Aguayo*, 45 P.R.R. 819, 825 (1933); *F. Rodríguez Hnos. & Co.* v. *Aboy* (per curiam), 66 P.R.R. 680 (1946).

■ Lastly, both appellants maintain that they are entitled to receive $349,881.75 by way of interest instead of the $59,800 computed, in which case plaintiffs-appellees would become their debtors. In other words, they invoke a covenant of anatocism under the contract of antichresis, capitalizing interest and charging interest on the capitalized interest. Apart from the fact that anatocism is repudiated, it will suffice to consider the Seventh clause of the contract of

antichresis and the fact that the farm produced income to pay the interest in order that we may disallow this claim.

## The Prescription

 Appellants invoke the acquisitive prescription of the ownership as well as extinctive of the action of plaintiffs-appellees. As to the declaration of nullity of the summary foreclosure proceeding, the action seeking such declaration does not prescribe according to our rulings. We have also held consistently that an action to establish the absolute nullity and nonexistence of contracts never prescribes. See *González* v. *Heirs of Díaz*, 69 P.R.R. 598, 609 (1949), and cases therein cited; *Sucrs. de Huertas González* v. *Díaz*, 72 P.R.R. 501, 505 (1951); *Costas* v. *G. Llinás, supra* at 698; *Oliver et al.* v. *Oliver*, 23 P.R.R. 168, 176 *et seq.* (1915); *Trías* v. *Porto Rico Leaf Tobacco Co.*, 50 P.R.R. 88, 92 (1936), and cases therein cited; *Crespo* v. *Schluter*, 58 P.R.R. 833, 839 (1941); *Gaztambide* v. *Heirs of Ortiz*, 70 P.R.R. 388, 402 (1949). See *Heirs of Ramírez* v. *Super. Ct.; Del Moral, Int.*, and *Ríos* v. *Banco Popular, supra* at pp. 353 and 385 respectively.[10]

 Appellants maintain that they merged the titles by their possession for more than 10 and 20 years. Should we part from a faulty possession of the predecessor and of the

---

[10] Even if some prescriptive period were applied, as maintained by appellants, we have said that an action seeking the nullity of a summary proceeding partakes of the nature of a *real* action. *Sabater* v. *Union Central Life Ins. Co.*, 41 P.R.R. 240, 242 (1930). Section 1863 provides that real actions with regard to real property prescribe after 30 years—without prejudice to the acquisitive prescription—which period had not elapsed as of the date of the auction sale, June 2, 1931, until the present action was brought on December 19, 1955. If we consider further that appellants were bound to return the property to its owners after they received fruits sufficient to pay the mortgage debt, as to the return of "La Molina" this was clearly a revendicatory action under the provisions of the third paragraph of § 280 of the Civil Code: "The owner holds a right of action against the holder and the possessor of the thing in order to recover it."

appellants because they had knowledge of the defects, as a result of the foreclosure proceeding, they would not have the good faith nor the just title required by the ordinary prescription. However, we would not need to decide it since we have already seen that the possession of the predecessor at the time of his death and that of the heirs was natural under the contract of antichresis, which could never lose its legal efficacy as a result of the summary foreclosure which was nonexistent at law. In this connection, § 376 provides that "Only the possession *acquired and enjoyed by a person in the belief that he is the owner* can serve as a title to acquire ownership," which precept was reaffirmed by the Code in § 1841—in the belief that he is the owner—for the purposes of acquisitive prescription, even for the extraordinary prescription which does not require good faith nor just title. See §§ 1857 and 1859.

The title of the predecessor acquired by judicial sale being void and nonexistent, he and his heirs always held the possession *in natura* given them by the contract of antichresis, never in the belief that they were owners, but by virtue of the license granted by such contract. See *Dávila* v. *Córdova*, 77 P.R.R. 125, 129 *et seq.* (1954) ; *Heirs of Rosa* v. *Heirs of Jiménez*, 77 P.R.R. 521, 525 *et seq.* (1954). Consequently, their possession being one of *license* of the owner, appellants could never acquire title by acquisitive prescription, not even if it were extraordinary.

■ Appellants further maintain that the action to liquidate the contract of antichresis had prescribed because the period for rendering accounts is 15 years. They are not right. Section 1872 provides that the term for the prescription of actions to demand the rendering of accounts runs from the day on which those who should have rendered them *cease in their offices*, and that pertaining to the action for the balance of accounts, from the date on which the latter was acknowledged by agreement on the parties interested.

In this case the contract of antichresis did not have a fixed term of duration nor was it ever terminated or rescinded, nor was the possession returned thereunder. Nor was the present action properly one of rendition of accounts under the antichresis. The liquidation of the rights and obligations of the parties under that covenant is the consequence of the action brought to revendicate the property and of the fact that the farm produced fruits sufficient and in excess to pay the mortgage debt.

The judgment rendered by the trial court was proper and correct as to the facts and the doctrine and it will be affirmed as to both particulars, subject to the slight modifications pointed out in the course of this opinion.

Mr. Justice Hernández Matos and Mr. Justice Blanco Lugo did not participate herein.